ALLISON M. RIGGS                                                PLAINTIFF

v.                                          CIVIL ACTION NO. 3:13-CV-1037-DW

CAROLYN W. COLVIN, Acting Commissioner of Social Security          DEFENDANT

## **MEMORANDUM OPINION**

Plaintiff Allison M. Riggs has filed a complaint pursuant to 42 U.S.C. §405(g)  to obtain

judicial review of a final decision of the Commissioner of Social Security that denied her

applications for disability insurance benefits (DIB) and supplemental security income (SSI).

Riggs applied for DIB and SSI on June 3, 2010, alleging that she was disabled as of Feb. 15,

2009, due to bipolar disorder, attention deficit disorder, depression, anxiety and body

dysmorphic disorder (Tr. 222).  The Commissioner denied Riggs' claims on initial consideration

(Tr. 106, 107) and on reconsideration (Tr. 130-131).  Riggs requested a hearing before an

Administrative Law Judge (ALJ) (Tr. 182).

ALJ George A. Jacobs conducted a hearing in Louisville, Kentucky, on March 30, 2012

(Tr. 43-75).  Riggs attended with her representative, Trevor Smith (Tr. 43).  Riggs and vocational

expert (VE) Tina Stambaugh testified at the hearing (Tr. 46-69. 70-75).  Following the

conclusion of the hearing, ALJ Jacobs entered a hearing decision on April 18, 2012, that found

Riggs is not disabled for the purposes of the Social Security Act (Tr. 22-38).

In his adverse decision, ALJ Jacobs made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act
       through June 30, 2012.

2.     The claimant has not engaged in substantial gainful activity since Feb.22, 2009,
       the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq*.).

3.  The claimant has the following severe impairments: bipolar disorder, anxiety disorder, post-traumatic stress disorder, obsessive compulsive disorder, and depression (20 C.F.R. 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant can perform simple, repetitive tasks with no production rate pace work, but rather goal-oriented work. The claimant can have occasional contact with co-workers and supervisors and no contact with the public.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.  The claimant was born on July 16, 1985, and was 23-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.  The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, App. 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from Feb. 22, 2009, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 27-37). Riggs sought review of the hearing decision by the Appeals Council (Tr. 19-21).

The Appeals Council denied her request for review, finding no reason under the Rules to review

ALJ Jacobs' decision (Tr. 1-6). The present lawsuit followed.

**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See, 20 CFR §§ 404.1505, 416.905(a).  To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed.  20 CFR §§ 404.1520, 916.920(a).  At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled.  See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971.  *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities.  See 20 CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii).  If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be

automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989). A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3) The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed

the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**The Material Facts.**

Claimant Allison Riggs is 5'10" tall, weighs 200 lbs. and is right-handed (Tr. 50). She was born July 16, 1985, and was 26-years-old at the time of the hearing held before ALJ Jacobs

on March 30, 2012 (Tr. 47).  Riggs is married, has a 2-year-old son with her husband, and is raising a 3-year-old niece and her husband's 9-year-old son (Tr. 48).  She lives with her husband and children in a single family residence, has a driver's license and a high school diploma (Tr. 48-49).  Otherwise, Riggs has no vocational training or military service.  She did not require special education classes in high school (Tr. 49-50).

Riggs has not worked since Feb. 22, 2009 (Tr. 50).  She does take college courses online, however, after she attempted to quit her course work, she was forced to resume taking online classes in order to defer the collection of her student loans (Tr. 51-52).  Riggs testified at the hearing that she does have physical problems with both of her knees, which cause her to experience pain if she stands for more than half an hour, although her doctor has not restricted her physical activities (Tr. 52-53).  Her only medications are bupropion XL, perphenazine and medication for migraine headaches, which she testified she has every day (Tr. 53).  According to Riggs, her daily migraine headaches last anywhere from an hour to seven hours and require her to avoid light and noise (Tr. 54).

Riggs testified that she suffers from anxiety, depression and bipolar disorder (Tr. 55).  According to her, her prescribed psychotropic medication does not provide her meaningful relief (Tr. 55).  She has problems with concentration and with being around people (Id.).  Otherwise, Riggs has only entered the hospital on one occasion due to her emotional problems when she self-admitted to University Hospital in October of 2011, but was released after several hours (Id.).  Riggs has been receiving monthly psychiatric treatment from a psychiatrist for approximately 9 years prior to the hearing.  She testified that her psychiatric treatment has not helped with her emotional problems (Tr. 56).

At the time of the hearing, Riggs was receiving treatment at UofL Psychiatric Services; before that, she received mental health treatment through Seven Counties Services (Tr. 61). Riggs explained that her symptoms include both auditory and visual hallucinations due to her bipolar disorder (Tr. 62). She explained that she "hears voices" and "people in my house." (Id.). She explained that she can hear "things being moved around" and "dishes being put in the sink" or the "washing machine going." (Id.). Riggs testified that she has told her therapist and her psychiatrist about these auditory hallucinations.

She currently is on medications of Geodon and lithium, but neither relieves the hallucinations for long according to her (Tr. 63). Riggs explained that it takes several weeks for her medications to take effect, and then she will feel better for approximately three weeks before her problems with hallucinations return. She also has experienced visual hallucinations, which include seeing people that are not there (Id.). Riggs testified that she sees phantom people walking around her home and has told her doctors about this situation (Tr. 63).

Riggs added that she experiences sleep disturbances approximately once-to-twice a month (Tr. 64). When these disturbances occur she will sometimes remain aware for up to 3 days (Id.). Riggs explained she is like "a zombie" at such times and cannot concentrate or focus on anything (Id.). Afterwards, she will sleep sometimes for a day or two. During the waking phase, Riggs experiences substantial swings in her mood (Tr. 64).

She also suffers from obsessive compulsive disorder (Id.). Riggs testified that she will repeatedly check the locks on the windows and the door of her home. Her blankets and towels have to be arranged in a specific fashion by color and size. Her dishes have to be stacked in a certain order in the cabinets (Tr. 64-65). According to her, she has in the past been late or missed appointments due to her OCD rituals (Tr. 65).

She also experiences panic attacks and has been on medication for panic attacks, which Riggs stated she experiences daily (Id.).  On an average day, Riggs estimated that she will have three panic attacks that last from half an hour up to two hours.  During these episodes, Riggs becomes very emotional, cannot catch her breath, feels like her heart is racing, sweats and experiences shaking hands (Tr. 66).  Riggs recalled that she has had such panic attacks in the past while working.  She also experiences paranoia and believes that her husband's ex-wife and her niece's mother and father are "out to get her" (Tr. 66).  Riggs has felt that people are following her and will change routes once a week as a result (Tr. 66-67).

Riggs testified that her depression causes her to experience unpredictable crying spells every day (Tr. 67).  She estimated that she has three or four such crying spells that last anywhere from 5 minutes to an hour every day.  About her daily activities, Riggs explained that her husband works the third shift and is present during the day to help her with the children (Tr. 68).  Riggs normally gets up around 10 a.m., when her husband will help her with the children (Tr. 56).  She will then lie on the couch and watch television with the younger children (Tr. 56).  Ordinarily, her husband will fix lunch and dinner (Tr. 57).

Riggs tries to go to bed at 11 p.m., but has difficulty sleeping due to bad dreams and the need to check the door and window locks (Tr. 58).  She is able to attend to her own personal needs, dress and bathe herself, make simple meals, and do the laundry and dishes (Tr. 58).  She does not vacuum, sweep, mop, shop or do yard work (Tr. 58-59).  Her husband cares for the family pets (Id.).  Riggs denied having any hobbies, exercising, traveling or reading, except for her online course work, which Riggs has attempted to withdraw from due to her psychiatric problems without success (Tr. 60, 68-69).  Riggs indicated she has no friends that visit and belongs to no social organizations, clubs or church (Tr. 60).

Riggs does not shop because it is too stressful for her to be in crowds of people (Tr. 68). Although she receives special accommodations from her online college due to her psychiatric condition, Riggs does not believe that she will be able to successfully continue her online college courses (Tr. 69-70).

Medical records reveal that Riggs received psychiatric treatment on various occasions, from June of 2006, through April of 2010 from Victoria Yunker, a board certified psychiatrist (Tr. 297-336, 337-382). On initial evaluation, Dr. Yunker diagnosed Riggs with bipolar and attention deficit disorders (Tr. 375). Riggs reported to the doctor on that occasion that she was tired and irritable and had experienced problems at work when she became mad at a customer (Tr. 371). The following year on July 10, 2007, Riggs (then Scheinost) returned to Dr. Yunker with reports of further difficulties in employment and in her romantic relationship with her boyfriend (Tr. 365-66).

Riggs related to the doctor that she had lost full-time employment and had been working part-time in customer service at a cable company where she had problems dealing with customers and stress (Tr. 365). Dr. Yunker noted on that occasion that Riggs' appearance, affect and behavior were all appropriate; her speech was natural and her thought was relevant (Tr. 365). Riggs' mood, however, was noted to be angry and she related a physical altercation with a boyfriend (Id.). Dr. Yunker continued her diagnosis of bipolar disorder, Type II, which remained unchanged when Riggs returned on Aug. 8, 2007 (Tr. 359-60). Riggs on that visit related financial problems caused by the failure of her then-roommates to pay their share of the rent (Tr. 359-60). Riggs related other financial problems caused by her spending and unpaid bills (Tr. 355-356). Examination revealed appropriate appearance, effect, behavior with natural speech, relevant thought and full orientation.

9

By November of 2007, Riggs reported that her boyfriend believed she was not doing well; the couple had been evicted from their apartment. Riggs reported difficulties in dealing with customers at work also (Tr. 252). Dr. Yunker continued her diagnosis of bipolar disorder and diagnosed anxiety disorder as well (Tr. 353). Riggs' medications on that occasion were noted to be Cymbalta, Effexor, Xanax and Risperdal. That December, Riggs reported to Dr. Yunker increased stress at work due to increasing customer call volume and pressure to sell (Tr. 347). Riggs related her impending marriage plans to the doctor, who once again noted her appearance, affect and behavior to be appropriate, her speech natural and her thought relevant (Id.). Riggs remained depressed, but otherwise her insight/judgment was adequate, memory intact and attitude cooperative (Tr. 348).

Riggs did not return to Dr. Yunker until April 29, 2009 (Tr. 344-346). By then, Riggs had married and was pregnant. She was not employed. She and her husband were then involved in a parental custody dispute in an effort to obtain custody of her husband's son from his ex-wife, whom Riggs reported had attempted to run her husband over with an automobile. Riggs reported being anxious and stressed, as well as depressed (Tr. 344-45). At that time she reported being on medications of Xanax and Zoloft.

Riggs also received mental health treatment from Seven Counties Services beginning in April of 2010, through October of 2011 (Tr. 383-83, 398, 399-407, 430-440). On her initial evaluation on April 12, 2010, Riggs related that she had been treated for bipolar disorder and ADD approximately a year ago by Dr. Yunker, but had stopped treatment after she lost her health insurance (Tr. 387). Riggs was taking medication for her condition until she became pregnant in August of 2008, after which she ceased all of her psychotropic medications, which resulted in her becoming easily agitated, anxious and crying (Id.).

Riggs on that occasion denied any history of suicidal thoughts, but reported being stressed and agitated over nothing. Riggs admitted that she had slapped her husband several times and reported mood instability, racing thoughts and excessive sleep (Id.). She related that she had no friends, stays home and keeps her husband home, as well (Tr. 388). Riggs related a history of a failed suicide attempt at age 19 when she took an overdose of Seroquel. She reported that her father was an alcoholic who had abused both Riggs and her mother and that her grandmother and aunts were treated for depression (Tr. 388).

Nevertheless, Riggs reported that she did attend church, had finished high school where she was a "C" student and was currently taking classes in criminal justice online from the University of Phoenix while getting "A's" and "B's" and liked it. Her most recent employment had been 8 months of temporary work that ended in January of 2009, preceded by a year as a customer service representative at Charter Communications where "she impulsively left when angry over not getting her Christmas vacation off." (Tr. 389). Riggs reported that when she was on her mediation prior to going off them she "was doing fine" so much so that her husband never saw her mood instability, agitation anxiety and depression prior to their marriage (Tr. 389).

Riggs asked to resume mental health counseling and to be put back on her medications. She reported prior treatment for bipolar disorder by both Dr. Yunker and Dr. Francia with medication treatment of Risperdal, Restoril and Xanax which she had not taken for over two years following the loss of her health insurance when she left her employment at Charter Communication. Riggs denied any suicidal or homicidal thoughts, or psychosis. She denied that she had ever had any auditory hallucinations. Riggs' husband confirmed the couple's dispute with his ex-wife, whom he acknowledged had attempted to run him over with her car (Tr. 389). Treatment assessment on that occasion indicates that Riggs did not appear to be paranoid.

Her appearance was noted to be withdrawn, her mood sad/depressed with difficulty concentrating and attending (Tr. 390). Initial diagnosis was affective psychosis (Tr. 392). Treatment notes from APRN Mary Hill dated June 22, 2010, indicate on that occasion that Riggs complained that she no longer could handle her moods, that she felt overwhelmed, had financial problems and had "walked out" on her last several jobs (Tr. 383-84). She reported that she had limited energy, crying spells, was irritable and had problems with impulsive spending (Id.). Riggs also reported seeing her deceased grandparents in her home and her son, when he was not in the house (Id.). Riggs reported prior diagnosis of bipolar disorder, ADD, body dysmorphic disorder which had been treated with Xanax, Risperdal, Topamax, Elavil, Seroquel, Zoloft, Wellbutrin, Cyprexa, Paxil, Effexor and Cymbalta (Id.).

Riggs reported at that time that she and her husband were involved in a protracted custody battle with his ex-wife for custody of their son (Tr. 384). Riggs also had legal problems after she was stopped by police while driving without insurance. She related her employment history to include work at a tanning salon and retail store manager, as well as part-time employment for 4-5 years (Tr. 384). Examination by APRN Hill on that occasion revealed Riggs to be clean and casually dressed, with good eye contact, normal speech, depressed affect and mood, logical and organized thought, no suicidal ideation with a prior history of two remote suicide attempts (Tr. 384). Hill noted Riggs' memory to be intact and her attention and concentration to be fair, with average intelligence, adequate fund of knowledge and fair insight and judgment (Id.). Hill diagnosed PTSD based on a history of physical abuse and rape. Hill assessed Riggs with a GAF score of 45 (Tr. 385).

When Riggs returned to APRN Hill at Seven Counties on Nov. 1, 2010, Riggs reported that she was agitated and irritable, depressed and crying. She related to Hill that she was

"stressed out" by financial problems and that her driver's license had been suspended for unknown reasons (Tr. 404). At that time Riggs was receiving therapy once every 6-8 weeks. Her current medications then were noted to be Lamictal, Geodon, Trazedone and Celexa (Id.). Riggs denied any side effects from her medications, although she indicated that the Trazedone produced no benefit with her anxiety. Nurse Hill observed that Riggs' appearance, judgment, insight, speech, though pattern, memory, concentration, cooperation and cognition were all within normal limits (Tr. 405). Her mood, however, was noted to be anxious and her thought content phobic (Tr. 405). Hill continued with a diagnosis of bipolar disorder and recommended that Riggs' medications be increased as well as her therapy schedule (Tr. 404).

Riggs returned the following month on Dec. 27, 2010, when she reported her depression to be worse with mood swings and crying spells (Tr. 402). She advised Nurse Hill that she had failed two online courses and had taken mental health leave from school. Riggs had not renewed her driver's license and had not taken her medications of Buspar and Trazedone for several weeks, allegedly because her husband, who was then unemployed, refused to pick up her medications (Id.). Riggs described herself as being a "basket case" for the past two months.

Nurse Hill recommended adjustments in several of Riggs medications, including an increase in her Buspar and Trazedone with a scheduled return in 8 weeks (Tr. 402). She also discussed with Riggs "realistic expectations of medications with all the external stressors" that Riggs was experiencing (Id.). Nevertheless, mental status exam again revealed Riggs' appearance, judgment, insight, speech, thought pattern, memory, concentration and cooperation to be within normal limits (Tr. 403). Her mood, once again however, remained anxious and depressed (Id.).

During this time, Riggs' adult outpatient therapist, LCSW James Covert, prepared a letter to the University of Phoenix dated Dec. 20, 2010 (Tr. 398). In his letter, Covert explained that Riggs was currently under psychiatric care of Seven Counties Services and had been prescribed psychiatric medication for her symptoms (Id.). Due to those symptoms, Covert expressed his opinion that she would not be able to apply herself to her on line college studies and that the added stress of school would exacerbate her symptoms. Accordingly, Covert requested that Riggs be exempted from her academic studies until June of 2011, when she would be re-evaluated (Id.).

Riggs' next treatment note from Seven Counties Services indicates that she returned to Nurse Hill on Feb. 10, 2011 (Tr. 400-401). On that occasion, Riggs reported that her depression did not seem to be better but "it [is] not severe." (Tr. 400). Riggs reported that she was sleeping less, that she had racing thoughts, and that her home situation continued to get worse (Id.). Riggs in this latter respect stated that her home situation was "driving me crazy." Riggs complained that she received little help from her husband with household chores, which were "basically all up to her." (Id.). Nurse Hill reported that Riggs acted like she had the stressors of being a single parent. Her current medications remained unchanged as did the diagnosis of bipolar disorder. Nurse Hill recommended an increase in several of Riggs' medications and recommended she return to the clinic in five weeks. Mental status examination on that occasion was identical to the preceding December examination (Tr. 401).

Registered nurse Kathleen Miller met with Riggs on March 8, 2011 (Tr. 399). Riggs then reported racing thoughts, anxiety, confusion and many home stressors (Tr. 399). She denied any audio or visual hallucinations, as well as any suicidal thoughts (Id.). Treatment notes indicate that weight gain and lethargy were the reasons for Riggs' visit with Nurse Miller (Id.).

APRN Hill met with Riggs at Seven Counties in May and July of 2011 (Tr. 435-436, 437-438). On May 10, 2011, Riggs reported to Hill that "everything's a mess." She continued to have problems with child custody; this time involving her niece in addition to problems with a reduction in her boyfriend's work hours. Riggs reported being depressed for days at a time, but viewed her problems being the result of home stressors, rather than medication issues. She reported sleeping poorly. Her mood was noted to be irritable and her thought content phobic, but otherwise Riggs was within normal limits in her appearance, judgment, insight, speech, thought patterns, memory, concentration and cognition (Tr. 438). When Riggs returned that July, she indicated that she had taken herself off of her psychiatric medications due in part to money that she owed to the pharmacy, but had resumed her medications the prior month and was feeling somewhat better, although she reported being depressed and anxious. Her sleeping was reported to be better, her appetite good and she denied any new medical problems (Tr. 435). Nurse Hill's assessment noted Riggs to be improved. Riggs' mental status examination results were identical to the results obtained in May (Tr. 436).

Riggs returned to Seven Counties on Aug. 28, 2011 (Tr. 433-34). She then reported continued stress "with just about everything - - finances, child care, disability…." (Tr. 433). She reported being depressed with fair sleep and poor appetite secondary to nausea. Her medications remained unchanged, except that Nurse Hill recommended restarting Lamictal. Diagnosis continued to be bipolar disorder along with anxiety disorder (Id.). Once again, her mental status examination results remained unchanged from the results obtained in July and May (Tr. 434).

On her final visit of record to Seven Counties, Riggs reported continued depression with increase in anxiety (Tr. 431). She claimed to experience psychotic episodes and paranoia, indicating that she was "seeing" people and had been for the past couple of years (Id.). She

reported decreased appetite along with crying spells (Id.).  Nevertheless, Nurse Hill reported her assessment of Riggs to be improved, despite Riggs' anxious, sad mood and phobic thought content.

Several weeks later on Oct. 15, 2011, Riggs self-reported to the emergency room at the University of Louisville for psychiatric evaluation (Tr. 447-48).  She reported a past history of depression and bipolar disorder with worsening anxiety and auditory and visual hallucinations (Tr. 447).  Riggs stated that she occasionally hears voices and sees nonexistent individuals in her home or the yard.  She related that she had been prescribed numerous antipsychotic and depression medications in the past, which she felt had no effect on her symptoms.  Riggs also reported numerous psychosocial stressors involving unpaid bills and child rearing (Tr. 447).

Mental status examination, however, revealed her to be alert, fully oriented, cooperative, with fluent/clear speech, normal affect and thought processes (Id.).  She also exhibited fair judgment, fair attention and concentration, poor insight but intact memory.  Admitting notes indicate that Riggs denied hallucinations or delusions on mental status examination (Id.).  Diagnosis on that occasion was anxiety disorder with migraine headaches and moderate psychosocial stressors for a GAF score of 50.  Riggs expressed dissatisfaction with Seven Counties Services and requested long-term therapy.  According to treatment notes, again she denied psychotic symptoms and did not appear to be a danger to herself or others (Tr. 448).  She was released from the hospital on the same date approximately three hours after admission.

Riggs began mental health treatment with the University of Louisville Psychiatric Group (Tr. 453-561, 462-63) in December of 2011, with her final treatment on Feb. 9, 2012 (Id.).  On initial assessment on Dec. 13, 2011, Riggs reported depression and anxiety as the reason for her referral (Tr. 455).  Treatment notes reflect a history of depression, bipolar disorder, PTSD, OCD,

anxiety, ADHD and schizophrenia.  Riggs indicated that she had been depressed since middle

school, that she had decreased energy and concentration, poor sleep, fluctuating appetite and

feelings of worthlessness and hopelessness (Id.).  She reported seeing "ghosts" daily throughout

the day around the house, as well as hearing the sound of her name being called (Id.).  Other than

her emergency room visit in October, however, Riggs denied any prior hospitalizations.  She

related two prior suicide attempts, one in 1998, and one in 2004 (Id.).  She also related a family

history of anxiety and depression in her maternal female relatives (Tr. 456).

At that time, Riggs had been married for three years and was caring for three children.

She reported currently being unemployed since February of 2009.  Riggs was noted to be

cooperative and alert, but tearful.  Her thought processes were reported to be organized with

good attention/concentration and intact memory with an average fund of knowledge and fair

judgment, insight and impulse control (Tr. 458).  Diagnosis on that occasion was OCD, PTSD,

bipolar disorder and ADHD (Tr. 459).  Riggs was prescribed Wellbutrin and psychotherapy.  Her

current GAF score was assessed at 60 (Id.).

Riggs returned to the U of L Psychiatric Group in February and March of 2012 (Tr. 463-

64).  On Feb. 9, 2012, Riggs reported that her Wellbutrin was helpful, but she continued to have

increased anxiety and panic attacks that lasted between 5 minutes and 2 hours daily, along with

nightmares 4-5 times a week (Tr. 463).  She also reported difficulties with her sleep and energy

level, along with decreased tolerance for frustration (Id.).  Riggs again reported auditory and

visual hallucinations.  Nevertheless, her mental status examination revealed good appearance,

appropriate behavior, intact memory, normal speech, euthymic mood, appropriate affect and

organized thought processes.  Diagnosis on that occasion was depression and PTSD.  Dr. Franki

assessed Riggs with a GAF score of 50 and increased her Wellbutrin dosage while initiating medication treatment with Propranolol.

Riggs returned the following month for further treatment at the U of L Psychiatric Group on March 8, 2012 (Tr. 464). She again reported feelings of stress related to her upcoming Social Security disability hearing (Id.). Riggs reported increased migraines secondary to this stress, along with panic attacks. She continued to report both visual and auditory hallucinations involving seeing phantom people for 10 years and hearing phantom noises in the kitchen (Id.). Riggs reported poor sleep with increased nightmares, as well. Mental status examination again confirmed good appearance, appropriate behavior, intact memory, full orientation, normal speech, appropriate affect, good insight, organized thought process and intact judgment (Tr. 464). Her mood, however, was noted to be anxious and her thought content included the reported hallucinations. Diagnosis remained PTSD and depression with borderline personality disorder and a GAF score of 50 (Tr. 464).

Dr. Jessica M. Huett, a licensed clinical psychologist, performed a consultative psychological evaluation of Riggs in Louisville, Kentucky on Sept. 13, 2010 (Tr. 394-397). Dr. Huett's diagnostic impression on that occasion as bipolar II disorder, anxiety disorder NOS, PTSD and body dysmorphin disorder (Tr. 396). Dr. Huett's mental status examination revealed distractible attention and variable concentration with normal memory capacity. Riggs was noted to be cooperative, but with restricted affect and pessimistic mood (Tr. 395-396). Riggs related that she had been diagnosed with bipolar disorder as a teenager and had attempted suicide twice (Tr. 396). She related periods of increased goal-directed activity and decreased sleep, along with problems with anxiety attacks, increased worry and restlessness. Nevertheless, Dr. Huett noted Riggs' speech flow to be normal, with appropriate thought content and "no report of

hallucinations." Riggs' intellectual abilities appeared to be average, along with her fund of knowledge and reality testing (Tr. 396). Dr. Huett concluded that she appeared capable of normal decision making and had adequate judgment. Riggs on that occasion reported trouble maintaining employment due to stress and trouble with authority (Tr. 396).

Dr. Huett assessed Riggs with a GAF score of 50. The doctor concluded that Riggs had moderate limitations in her ability to understand, remember and carry out instructions toward the performance of simple, repetitive tasks; that her ability to tolerate stress and pressure of day-to-day employment was markedly limited; that she had the ability to sustain attention and concentration towards the performance of simple, repetitive tasks with moderate limitations; and that she was moderately to markedly limited in her ability to respond appropriately to supervision, co-workers and work pressures (Tr. 397).

### Legal Arguments.

Riggs objects to findings of fact 4, 5, 9, 10 and 11 of ALJ Jacobs' hearing decision (DN 14). In finding of fact no. 4, the ALJ determined that Riggs' severe impairments, alone or in combination, do not meet or medically equal the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1 (Tr. 28-30). ALJ Jacobs determined in finding no. 5 that Riggs retains the RFC to perform a full range of work at all exertional levels with nonexertional limitations to simple, repetitive tasks with no production rate pace, goal oriented work, and only occasional contact with co-workers and supervisors, and no contact with the public (Tr. 30-36). Riggs challenges both of these findings based upon arguments that she also asserts with respect to findings 9, 10 and 11 (DN 14, pp. 11-12). In these final findings, ALJ Jacobs respectively concludes that the transferability of job skills is not material to the determination of disability,

19

that Riggs remains capable of performing alternative work, and therefore is not disabled (Tr. 36-37).

Riggs begins her fact and law summary by challenging the findings of the ALJ concerning her concentration, persistence or pace contained on p. 5 of the hearing decision (Tr. 29). Riggs argues that the finding of ALJ Jacobs that she has no more than moderate difficulties in the area of concentration, persistence or pace is inaccurate and does not consider the record as a whole. Riggs points out in this respect that the ALJ erroneously cited to duplicate records in exhibits 3F, p. 2; and 7F, p. 16 (Tr. 384, 423). She adds that other assessments of her concentration and attention from April of 2010, and December of 2011, show diminished concentration (Tr. 390, 345). Also, according to her, no consideration was given to the finding of racing thoughts.

As for her online college course work, Riggs points out that despite the third party function report from her mother, which indicates that Riggs appeared to be doing well, the record as a whole actually showed that she was failing in her online course work and had unsuccessfully requested to terminate it based on her mental problems (Tr. 398, 402). These circumstances, Riggs contends, directly contradict the ALJ's reliance upon her unsuccessful online college efforts to establish her adequate concentration.

As for finding no. 5, with respect to her RFC, Riggs protests that ALJ Jacobs improperly limited his consideration of the record only to her attention and concentration, while ignoring the severe limitations imposed on her affect, mood and thought content by her psychiatric symptoms arising from her bipolar disorder, depression, OCD, PTSD, and anxiety disorder. These findings, according to Riggs, show that her affect and mood are repeatedly noted to be anxious with phobic thought content (Tr. 401, 403, 405, 411, 413, 417, 419, 421, 432, 434, 435, 438, 445, 454,

458 and 463).  These same findings show that Riggs avoids people, experiences irregular sleep patterns, engages in obsessive behaviors that interfere with her ability to function, and prefers to remain in bed if possible (DN 14, p. 4) (Tr. 64-65).

In particular, Riggs points to a partially completed form from one of her employers dated Aug. 5, 2010 (Tr. 262-63), wherein the human resource coordinator indicates that Riggs was placed on final written notice due to her poor work attendance.  The form indicates that the company would not hire her again as "she abandoned her job by not calling in or showing up for two consecutive scheduled shifts."  (Tr. 263).  Riggs consequently contends that ALJ Jacobs based his decision on a "myopic view of the record" in which he focused only on those few findings in the normal range, while ignoring repeated treatment notes that indicate anxious affect and mood, phobic thought content, diminished concentration, decreased energy, and auditory and visual hallucinations (Tr. 401, 411, 413, 417, 419, 432, 434, 436, 438, 454, 458).

Riggs also maintains that ALJ Jacobs mischaracterized the consultative examination results obtained by Dr. Huett (Tr. 32).  Riggs contends that the ALJ omitted Dr. Huett's observations about her history of two suicide attempts and her family history of domestic violence, as well as her reported sleep problems, anxiety attacks, worry and restlessness (Tr. 396).  Given the nature of these reports and Dr. Huett's findings based thereon, Riggs contends that ALJ Jacobs' characterization of Dr. Huett's report as being "unremarkable" is at best enigmatic, particularly in light of the remaining portions of the record that confirm her diagnosis of PTSD and childhood abuse (Tr. 384, 459).

Riggs next takes issue with the credibility determination made by the ALJ at p. 8 of his hearing decision (Tr. 32).  Riggs focuses on the credibility findings as they relate to her sleep disturbance and her reports of auditory and visual hallucinations (DN 14, pp. 5-6).  Riggs

contends that reports of her variance in sleep, excessive or insufficient sleep, are classic symptoms of bipolar disorder that do not reflect on her credibility (Tr. 240, 311, 315, 324, 329, 39, 348-49, 357, 375, 387-89, 391, 399-400, 402, 418 and 437). Accordingly, she maintains that this credibility finding has no actual basis in fact.

Likewise, Riggs insists that review of her medical records confirms repeated reports of daily hallucinations (DN 14, p. 6). These reports call into serious question ALJ Jacobs' determination that the record does not support the existence of her hallucinations merely because on several occasions Riggs did not happen to mention them prior to October of 2011, when she first revealed them to her therapist at Seven Counties Services. Riggs points out that her psychiatric symptoms were so severe as to require her hospitalization at the University of Louisville Hospital in mid-October of 2011 (Tr. 442). The emergency room doctor's psychiatric evaluation on that occasion also confirms her reports of auditory and visual hallucinations, which are noted in the treatment notes of the U of L Psychiatric Group, as well (Tr. 464). Accordingly, the medical records in her view fully confirm the hearing testimony that her psychiatric condition has not improved, but rather has gotten worse in the months preceding the hearing (Tr. 54-55, 57-58, 62-63, 67). All of her complaints Riggs insists are confirmed by the medical treatment records at the U of L Psychiatric Group (Tr. 454-464), which themselves reveal panic attacks, nightmares, sleep difficulties, decreased frustration tolerance, and multiple reports of hallucinations (Tr. 455, 463).

Riggs further argues that ALJ Jacobs erred in his reliance upon the medical source statement prepared by APRN Mary Hill (Tr. 428, 429). Examination of this medical source statement in Riggs' view conflicts with ALJ Jacobs' finding that she remains capable of performing substantial gainful activity (DN 19, p. 8-9). For example, according to Riggs, Nurse

Hill found that Riggs' ability to maintain attention and concentration for extended periods was merely "fair," as was her ability to work with or near others, and her ability to accept instructions and respond appropriately to written criticism or changes in the workplace (Tr. 428, 429). Riggs points out that the designation "fair" indicates that she can only perform these activities "some of the time." (Tr. 428). "Some of the time" in her view does not translate into an 8-hour workday, five days a week.

Riggs also disputes the ALJ's observation at p. 11 of his hearing decision (Tr. 35) that she was adequately performing the duties of her past relevant work, despite her mental condition, when she was laid off from her position as an administrative assistant after 10 months of employment in 2009 (Tr. 35, 394-97). This observation by the ALJ, Riggs claims, ignores her testimony that she had been reprimanded repeatedly by her employer for calling in sick, leaving work early and transferring the phone calls from customers to other service representatives, along with having disputes with her co-workers (Tr. 61). In fact, Riggs testified during the administrative hearing that she had been reprimanded by her former employer eight times in less than a year.

Finally, Riggs challenges the ALJ's finding of discrepancies between her activities of daily living and her claim of disabling limitations as a basis for the ALJ's adverse credibility determination (DN 14, p. 10). Riggs contends that not only is her participation in online college course work not consistent with full-time employment, but it ignores her lack of success in her online course work, as well. Further, she adds that, as for childcare responsibilities, her husband performs most of these responsibilities during the day, and also takes care of the household as well (Tr. 56-59, 357). Even so, her ability to function within her household is not per se indicative of Riggs' ability to function in the workplace, given her testimony that she has few

23

friends, avoids public interaction, and prefers to remain in bed (Tr. 322, 383, 387, 388, 390, 418, 455 and 459). While the ALJ may have declined to provide significant weight to the various GAF scores that Riggs obtained upon mental status evaluation, these "snapshots" to use the Commissioner's terminology, confirmed the up and down fluctuation resulting from her longstanding history of bipolar disorder, a fluctuation in her view that is inconsistent with productive work (DN 14, p. 11).

**Finding of Fact No. 4**

Riggs' arguments with respect to finding of fact no. 4 do not put at issue the conclusion of ALJ Jacobs that her mental impairments do not medically meet or equal the severity of either listed impairment 12.04, the listing for affective disorders, or 12.06,the anxiety disorders listing, of Part 404, Subpart P, Appendix 1. Rather, Riggs' arguments are limited to the "paragraph B" criteria for her concentration, persistence or pace (DN 14, p. 2). To the extent that the paragraph B criteria set forth the RFC finding of the ALJ made in finding no. 5, Riggs takes issue with them.

Riggs' initial argument calls into question the manner in which the ALJ evaluated her mental impairments under the applicable federal regulations found in C.F.R. §§404.1520(a), 404.1545(c), 416.920(a) and 416.945(c). The cited regulations advise that when the SSA evaluates the mental abilities of a claimant, it first must assess the nature and extent of the claimant's mental limitations and restrictions and then determine the RFC of the claimant for work activity on a regular and continuing basis. See C.F.R. §§ 404.1545(c), 416.945(c). If the claimant has a limited ability to carry out certain mental activities, i.e., limitations in understanding, remembering and carrying out instructions, or in responding appropriately to

supervision, co-workers and work pressures in the work setting, such limitations may reduce the ability of the claimant to perform his or her past work or alternative work.  Id.  *See gen., Allen v. Colvin*, Case No. 3:10-CV-01024, 2014 WL 1775564 at *14 (M.D. Tenn. Apr. 29, 2014).

In such a situation, the ALJ is required to apply findings involving mental limitations based upon the "special technique" which is a series of steps explained in subsections (b) through (e) of 20 C.F.R. §§404.1520(a) and 416.920(a).  Under these regulations, the ALJ first evaluates the claimant's symptoms, signs and laboratory findings to determine if the claimant has a medically determinable mental impairment.  20 C.F.R. §§404.1528a(b)(1), 416.920a(b)(1).  If the claimant has determinable mental impairments, then the ALJ next must assess the degree of functional limitation caused thereby.  See 20 C.F.R. §§404.1520a(b)(2), 416.920a(b)(2).  The ALJ in performing this duty is to consider all the relevant evidence to obtain a "longitudinal picture of the overall degree of functional limitation."  20 C.F.R. §§404.1520a(c)(1), 416.920a(c)(1).  The cited regulations require the ALJ to evaluate the effects of the claimant's symptoms and how the claimant's functioning may be affected by his or her chronic mental disorder, medication, mental health treatment and other factors.  *Allen*, 2014 WL 1775564 at *14.

Once the ALJ has performed these first two steps, then the ALJ is required by 20 C.F.R. §§404.1520a(c)(3) to rate the claimant's functional limitations in four areas that include activities of daily living, social functioning, concentration, persistence and pace, and episodes of decompensation, which collectively are referred to as the "paragraph B" criteria based on the list of mental disorders contained in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ with respect to each of the four functional areas is required to assess the first three using a 5-point assessment scale which includes ratings that range from minimal limitations such as "none," and

gradually increase in severity to "mild," "moderate," "marked," and "extreme."[1]  If the ALJ

determines that the claimant's nonexertional limitations in activities of daily living, social

functioning or concentration, persistence or pace fall into the "none" or "mild" categories, then

the claimant's mental impairment ordinarily will be determined to be nonsevere so as to justify

the denial of the claimant's application.  *See Rabbers v. Comm'r*, 582 F.3d 647, 653 (6th Cir.

2090) (citing 20 C.F.R. §404.1520a(d)(1)).  If the claimant's mental impairment, however, is

considered to be severe, then the ALJ must determine if the mental impairment is so severe as to

meet or equal the severity of a listed mental impairment; if not, only then does the ALJ continue

to assess the RFC of the claimant.  See 20 C.F.R. §§404.1520a(d)(2)-(3), 416.920a(d)(2)-(3).

While Psychiatric Review Technique ("PRT") findings and the RFC determination technically

serve different purposes, an ALJ may incorporate PRT findings into his RFC finding on

occasion.  *See Thompson v. Comm'r*, 2014 WL 1232722 at *7 (W.D. Mich. Mar. 25, 2014).  To

this extent, Riggs takes issue with the PRT findings.

The challenged findings are contained on page 5 of ALJ Jacobs' hearing decision (Tr.

29), whereat he finds Riggs to have moderate difficulties with her concentration, persistence or

pace.  In reaching this conclusion, the ALJ relies upon Riggs' own function report (Tr. 238-250),

wherein she indicates that she is able to drive, use a computer, count change, manage a

checkbook and e-mail family members (Id.).  ALJ Jacobs continues to acknowledge that Riggs

has problems with her memory and concentration, but evidence of record indicates that her

memory is intact and her attention and concentration is repeatedly characterized as being "good,"

"intact" or "within normal limits."  The ALJ cites as support for this determination a number of

---

[1]   The functional area that involves episodes of decompensation is rated on a separate 4-point scale with categories
of none, one or two, three and four or more.  See 20 C.F.R. §§404.1520a(c)(4), 416.920a(c)(4).  Neither party
disputes that Riggs suffered no episodes of decompensation.

exhibits that include Riggs' work history and function report (Tr. 229-237, 238-50), the Seven Counties Services' treatment notes from February of 2011 (Tr. 401), December of 2011 (Tr. 403), and November of 2010 (Tr. 405), along with the Psychiatry Progress Notes of APRN Hill on various dates which repeatedly indicate Riggs' concentration to be within normal limits (Tr. 411, 413, 415, 417, 419, 421, 423). ALJ Jacobs also cites the Seven Counties Services treatment notes of May, July, August and October of 2011, which the Commissioner concedes contain certain duplicate entries of the earlier Seven Counties Services treatment notes (Tr. 432, 434, 436, 438). Besides above cited support for his PRT finding, the ALJ also cites the U of L Hospital emergency room record of Oct. 15, 2011 (Tr. 445), along with the U of L Psychiatric Group Outpatient notes dated Jan. 20, 2012 (Tr. 454) and that of Dec. 13, 2011 (Tr. 458).

The Court has examined all of the cited medical records relied upon by ALJ Jacobs in his PRT finding on Riggs' concentration, persistence and pace (Tr. 29). While several of the entries are, as Riggs points out, duplicative, the record as a whole is strongly supportive of the challenged finding that Riggs has no more than moderate difficulties in her concentration, persistence or pace. Repeatedly, her concentration is noted to be within normal limits, and her memory intact (Tr. 401, 403, 405, 411, 419, 421, 432, 434, 436, 438, 445, 458). While certain progress notes on specific dates do indicate diminished concentration, the vast majority of the treatment notes cited above confirm the finding by the ALJ with respect to Riggs' ability to concentrate, maintain persistence and pace within the limitations set forth in the RFC finding contained in finding of fact no. 5. The Court consequently cannot say that substantial evidence does not support the finding of the ALJ in this respect.

Certainly, the claimant's history of online college course work does not compel an opposite conclusion. Riggs initially appeared to be doing well with her online criminology

courses through the University of Phoenix, as her mother's adult third party function report confirmed. Not until Riggs was unable to obtain her psychotropic medication and became embroiled in an ongoing custody dispute involving her husband's son did her course work substantially decline (Tr. 402). Otherwise, when on her medication, Riggs was able to do well (Tr. 252). The Court therefore concludes that ALJ Jacobs' reliance upon Riggs' online college course work as support for his PRT finding was not erroneous, nor would an inability to successfully complete online college course work necessarily call into question the ALJ's nonexertional limitations in finding of fact no. 5 (Tr. 30), which limited Riggs to simple, repetitive tasks with no production rate pace. For these reasons, the Court rejects Riggs' initial challenge to finding of fact no. 4, which the Court as noted concludes is supported by substantial evidence.

**Finding of Fact No. 5.**

The Court turns next to Riggs' challenge to the RFC finding contained in the hearing decision at finding no. 5 at pp. 6-12 (Tr. 30-36). ). Residual functional capacity is defined by regulation as being "the most you can still do despite your limitations." 20 C.F.R. §§404.1545(a)(1), 416.945(a)(1). *See Luteyn v. Comm'r of Soc. Sec.*, 528 F. Supp.2d 739, 750 (W.D. Mich. 2007) ("RFC is the most, not the least, a claimant can do despite his impairments."). The Commissioner is required by regulation to assess a claimant's RFC "based on all the relevant evidence in [the claimant's] … record." *Id*. *See Bingham v. Comm'r*, 186 Fed. Appx. 624, 647-48 (6th Cir. 2006) ("The ALJ is ultimately responsible for determining a claimant's RFC based upon relevant medical and other evidence of record.").

In assessing a claimant's residual functional capacity, the Commissioner will consider all of his or her medically determinable impairments including both severe and non-severe impairments. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). *See Reynolds v. Comm'r* , 424 Fed. Appx. 411, 417-18 (6th Cir. 2011) ("It is true that an ALJ must determine a claimant's residual functional capacity, considering 'numerous factors' including 'medical evidence, non-medical evidence, and the claimant's credibility.'") (quoting *Coldiron v. Comm'r*, 391 Fed. Appx. 435, 443 (6th Cir. 2010)). See also, SSR 96-5p, 1996 WL 374183 at *3 (July 2, 1996). It is the responsibility of the claimant to provide the evidence that the Commissioner will evaluate in making the RFC finding. See 20 C.F.R. §§404.1512(c), 416.912(c). The Commissioner also will consider any statements of the claimant provided by medical sources about what he or she remains able to do, as well as any descriptions or observations of the claimant's limitations caused by his or her impairments that are provided by the claimant, the claimant's family, friends or other persons. 20 C.F.R. §§405.1545(a)(3), 416.945(a)(3).

A finding of residual functional capacity is used at step 4 of the sequential evaluation process first to determine whether the claimant remains capable of performing his or her past relevant work. See 20 C.F.R. §§404.1520(f), 404.1560(b), 416.920(f) and 416.960(b). If the Commissioner determines that a claimant is not able to perform his or her past relevant work, or does not have past relevant work, then the RFC determination is used at step 5 of the sequential evaluation process to determine whether the claimant can adjust to any other work that exists in the national economy. See 20 C.F.R. §404.1520(g), 404.1566, 416.920(g) and 416.966. In this respect, the RFC assessment is used along with information concerning the claimant's vocational background in making the disability determination. *Id.*

Riggs, as noted, indicates that the ALJ selectively reviewed the record and omitted from his consideration her history of depressed and anxious mood and affect, as well as her phobic thought content (DN 14, pp. 3-4). It is true that various treatment notes, all of which are summarized above, do indicate a depressed and anxious mood and affect with phobic content. The same treatment notes, however, as the Commissioner correctly points out, repeatedly show that Riggs' memory, attention and concentration are intact; that she exhibits good eye contact, fair insight and judgment, and logical and organized thoughts (Tr. 31, 384, 401, 403, 405, 411, 415, 417, 421, 432, 434, 436, 438, 445,458).

The RFC finding of ALJ Jacobs also is supported by the medical source statement prepared by APRN Mary Wilson dated May 19, 2011 (Tr. 428-429). In this medical source statement of Riggs' ability to do work-related activities (mental), APRN Hill concludes based on her observations and interactions with Riggs that she has an excellent ability to carry out short, simple instructions as well as a good ability to perform activities on schedule, maintain attendance, sustain ordinary routine, make simple, work-related decisions, complete a normal workday, perform at a persistent pace, interact appropriately with the public, answer simple questions, get along with co-workers, use public transportation, and make plans independently (Tr. 428-429).

While APRN Hill is not a medically acceptable medical source, ALJ Jacobs nevertheless was entitled to place great weight on her opinion given her repeated interactions and observations of Riggs during her mental health treatment (Tr. 35). APRN Hill admittedly did find that Riggs had only a fair ability to carry out detailed instructions or to maintain attention and concentration for extended periods, respond appropriately to criticism and get along with co-workers. The non-exertional limitations contained in the RFC finding of ALJ Jacobs, however,

account for all of these problems so that the RFC for a full range of work performing simple repetitive tasks with no production rate and only occasional contact with co-workers and supervisors adequately accounts for Riggs' mental limitations and is supported by substantial evidence.

The Court also rejects Riggs' argument that ALJ Jacobs' evaluation of her auditory and visual hallucinations is "without foundation in fact." The record is relatively clear that Riggs herself raised virtually no complaints of either visual or auditory hallucinations prior to her treatment in October of 2011 (Tr. 32-33, 389-399, 401-403, 405-411, 418, 421, 434, 438). As the Commissioner notes, in April of 2010, Riggs directly denied ever experiencing auditory hallucinations (Tr. 389). The following year in March of 2011 she likewise denied both auditory and visual hallucinations (Tr. 399). Treatment progress notes prior to October of 2011, also indicated that she denied experiencing hallucinations (Tr. 401, 403, 405, 411, 418, 421, 434, 438).

The Court also notes that on several occasions when Riggs did complaint of hallucinations, she provided inconsistent information on one occasion indicating that she had experienced hallucinations for only two years (Tr 431), and on another occasion indicating that she had experienced them for ten years (Tr. 464). Given this dramatic inconsistency in the record, the ALJ cannot be faulted for concluding at pp. 8-9 of his hearing decision (Tr. 32-33) that her statements in this regard were materially inconsistent.

Substantial evidence also supports ALJ Jacobs' findings at p. 8 regarding the inconsistent nature of Riggs' statements concerning her sleep difficulties. Examination of the medical records indicates that on repeated occasions the difficulty experienced by the claimant with her sleep appears to have been related to problems other than her depression, such as childcare and

custody issues, her husband's own employment problems, and her personal financial difficulties (Tr. 399-400, 418-437). Riggs indicated on at least one occasion that if possible she would sleep 10 hours a day (Tr. __). The ALJ accordingly did not selectively or erroneously evaluate the record in taking into consideration Riggs' various and sometimes inconsistent reports concerning her sleep problems in assessing her credibility.

The law is well established that an administrative law judge properly may consider the credibility of a claimant when evaluating the claimant's subjective complaints, and the federal courts will accord "great deference to that credibility determination." *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004). When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant. *Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters*, 127 F.3d 525, 531 (6th Cir. 1997)). The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility." *Id.* (citing *Rogers*, 486 F.3d at 247) (citing SSR 96-7p, 1996 WL 374186)). Under SSR 96-7p, the ALJ must in the hearing decision set forth specific reasons for the credibility determination sufficient to make clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight. *Winning*, 661 F. Supp.2d at 823. A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p. *Id.* (citing *Rogers*, 486 F.3d at 248). ALJ Jacobs hearing decision properly satisfies these requirements in finding Riggs to be only partially credible.

Riggs' criticism that ALJ Jacobs brushed aside the adverse contents of the consultative psychological examination performed by Jessica Huett, Psy.D., on Sept. 13, 2010 (Tr. 394-397) also falls wide of the mark. While the ALJ did generally characterize Dr. Huett's findings as

being "largely unremarkable," the ALJ accurately set forth the great bulk of those same findings, both supportive and adverse. In other words, the ALJ at p. 8 of his hearing decision specifically included the findings by Dr. Huett that Riggs' attention was distractible and her concentration variable with a restrictive affect and pessimistic mood (Tr. 32, 396). The ALJ continued to also note that Riggs exhibited normal eye contact, normal speech flow, appropriate thought content, goal-directed organization of thought, and adequate judgment and reality testing (Id.). Riggs also on that occasion did not complain of any history of hallucinations with the report indicating that "there is no report of hallucinations." (Tr. 396).

It is true that ALJ Jacobs in this portion of his hearing decision did not relate Riggs' report to Dr. Huett of two remote suicide attempts, one in 1999, and another in 2004 (Tr. 396). This omission, however, in the Court's view does not call into question the nature of the substantial evidence that supports finding of fact no. 5. The Court notes that Riggs had no current history of any suicidal ideation. In fact, treatment notes repeatedly reflect that she was not at risk for suicide. Riggs herself indicated that she would not commit suicide given her responsibility as a parent and care provider for three children.

Further, ALJ Jacobs properly accorded little weight to the work-related limitations assessed by Dr. Huett given that the doctor's assessment was inconsistent with the record as a whole and based on Riggs' own subjective statements, which the ALJ properly determined to be only partially credible (Tr. 35). Riggs herself indicated during therapy that she had voluntarily ceased employment from her latest job after being denied her request for vacation time during the Christmas holidays. (Tr. 389). She likewise indicated that she had been too quick to impulsively quit prior jobs. (Tr. 422). Such statements call into question the limiting effect of

her non-exertional impairments, which the record suggests were well controlled when Riggs regularly took her psychotropic medications.[2]

The work-related restrictions imposed by Dr. Huett also are contrary to the results of the state agency reviewing psychological consultants, both of whom did not impose the type of severe limitations found by Dr. Huett (Tr. 112-115, 122-126). Although the state agency reviewing consultants, Mary K. Thompson, Ph.D. (Tr. 122-124) and Jane Brake, Ph.D. (T. 136-140) did not have available Riggs' most current medical records, those records created after March 31, 2011, their opinions nonetheless appear well in line with the nature of the symptoms expressed by Riggs based on her diagnosis and the resulting limitations as determined by their review of the available record. *See Helm v. Comm'r*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011); *Blakley v. Comm'r*, 581 F.3d 399, 409 (6th Cir. 2009).

The Court on the whole considers the decision of ALJ Jacobs to be well supported by the record and in accordance with law. The ALJ properly found Riggs' testimony and statements concerning the limiting effects of her symptoms, and the nature of those symptoms, to be only partially credible given the inconsistencies in the record. The Court agrees. This credibility finding is entitled to substantial deference, and just as importantly, is supported by substantial evidence. The ALJ, contrary to Riggs' arguments in her fact and law summary, did not "cherry pick" the record to include only the adverse portions that are supportive of his ultimate determination to deny Riggs' claim for DIB and SSI benefits. Substantial evidence based on the testimony of the vocational expert, which identifies a substantial number of alternative work that Riggs remains capable of performing given her limitations, supports the decision of the ALJ.

---

[2]  Indeed, Riggs' symptoms were so well controlled by medication prior to her marriage that her husband related that he was unaware of her mental health problems before he married her (Tr. 389).

Accordingly, for the reasons set forth above, the Court shall enter a judgment that **AFFIRMS** the decision of the Commissioner and **DISMISSES** Riggs' complaint with prejudice.

Cc:     Counsel of Record